# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned On Briefs August 17, 2011

## STATE OF TENNESSEE v. JOHN WESLEY WRIGHT

**Appeal from the Circuit Court for Dickson County**
**No. CR-9019     Larry J. Wallace, Judge**

---

**No. M2011-00436-CCA-R3-CD - Filed November 4, 2011**

---

The Defendant, John Wesley Wright, was convicted by a Dickson County Circuit Court jury of theft of property valued at ten thousand dollars or more but less than sixty thousand dollars, a Class C felony. See T.C.A. §§ 39-14-103, -105 (2010). He was sentenced as a Range II, multiple offender to seven years' confinement. On appeal, the Defendant contends that (1) he was denied his right to a speedy trial, (2) the evidence was insufficient to support his conviction, and (3) he received the ineffective assistance of counsel. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., and DONALD PAUL HARRIS, SR.J., joined.

Mitchell B. Dugan (at motion for new trial and on appeal), Dickson, Tennessee and Anita Lynn Coffinberry (at trial), Erin, Tennessee, for the appellant, John Wesley Wright.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Dan Mitchum Alsobrooks, District Attorney General; and Carey Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the theft of a trailer and cattle. At the trial, Terry Lemons testified that he worked for the Dickson Livestock Center (Center) and that he had over forty years' experience in the livestock business. He said he knew and recognized the Defendant from doing business at auction sales. A Center seller history report showed the Defendant had conducted business with the Center. Mr. Lemons said the Defendant visited the Center on November 27, 2006. He stated that he was working in his office when a truck with large livestock caught his attention. Mr. Lemons said the Defendant left the truck, came into his office, and stated he had unloaded seven "fat steers that had been on feed for a long time."

Mr. Lemons said the Defendant told him he needed an "early sale" on the cattle due to financial difficulties. Mr. Lemons told the Defendant that he would try to sell the cattle. He said that the Defendant left after they discussed the auction of the cattle and that he saw the Defendant pull a white twenty-foot gooseneck trailer as he drove away.

Mr. Lemons testified that he noticed that the seven cattle the Defendant processed for sale were "fat steers." He said that the size of the cattle caught his attention because they "were exceptionally good" and that Tennessee mostly has "feeder cattle" that are sold to people who are going to fatten and resell the cattle for slaughter. He said the cattle the Defendant brought for sale were "choice cattle" and were ready for slaughter. He said similar cattle were not normally sold at the Center and needed to be sold at an auction that regularly auctioned choice cattle.

Mr. Lemons testified that the size of the cattle raised his suspicion. He said that the cattle had markings called "ear notches" that were used for identification and that each of the cattle had an outline of a brand in the same place. He said that unlike Tennessee, the western states are known for auctioning branded cattle because branding is mandatory under state laws. He said some of his customers branded their cattle for identification purposes and most of the brands were placed on a steer's hip. Mr. Lemons said he determined that there was a "DJ" brand on each of the seven cattle the Defendant brought for sale.

Mr. Lemons testified that after he found the DJ brand on each steer, he contacted the Livestock Marketing Agency to ask if any cattle with a DJ brand were reported missing or stolen. He said the Agency faxed him a report showing that the Defendant's cattle matched the description of stolen cattle from Kansas. The report stated that ten steers were stolen and that they had "black/white face" with one being a "Charolais cross," a French breed of cattle. Mr. Lemons identified a photograph of one of the steers the Defendant brought for sale and said the steer was a Charolais cross. Mr. Lemons said he contacted the police and told Agent Milli Binkley what he discovered.

On cross-examination, Mr. Lemons testified that he was certain he saw the Defendant on November 27, 2006. He said Center employee Jane Ellen Tomlinson issued the receipts for the cattle, and he identified her initials on the booking receipt. He said that he had seen thousands of Charolais cross cattle before November 27 and that the Center sold Charolais cross cattle every Tuesday. Mr. Lemons described the other cattle brought in by the Defendant as follows:

> There [were] four black steers, a black/white faced, I think a
> gray steer with no horns, and then a - kind of mouse colored

-2-

Charolais cross calf . . . with what we call rope tails in the
industry, and he had a black spot on his shoulder.

Mr. Lemons testified that each steer was branded on the shoulder and that the outline of the brand was visible but that the hair had to be shaved to determine the specific brand. He said the steers had notches in both ears but none had tags in their ears. He agreed that the Agency report said the stolen cattle had orange ear tags but that the cattle the Defendant brought for sale did not have ear tags. He stated that removing ear tags is not difficult and that it could be done in a matter of seconds with a knife. He said if ear tags were removed, the holes closed quickly. He did not see any holes in any of the steers's ears, but he did see at least one notch in each ear. He said that although he did not "closely inspect" the cattle, he did not see any scars on their ears. He estimated that had the cattle been sold in Dickson County, each would have sold for approximately $1000 based on weight.

On redirect examination, Mr. Lemons testified that the brand on the seven steers was "a D over J, which would be Jarboe." He said Delbert Jarboe was the person who reported the stolen cattle and trailer. He said it was common for ranchers to use their initials as their brand. On examination by the trial court, Mr. Lemons testified that in Tennessee, a steer's hip is the usual brand location but that different locations are used in other states, including the side and shoulder.

Tennessee Department of Agriculture criminal investigator Milli Binkley testified that on November 27, 2006, she received a telephone call from Mr. Lemons reporting possible stolen cattle at the Center. Agent Binkley went to the Center to investigate and had the seven steers shaved in order to determine if the brand was the same as the brand on the stolen cattle report. She said that the brand was located on each steer's shoulder and that the design was a "D with a J coming out from it."

Agent Binkley testified that she received a report of a stolen truck, trailer, and cattle from Mr. Lemons. She said she went to see Frank Wright, the Defendant's brother, in Montgomery County to determine if the truck and trailer were parked there. She said that a truck and trailer that fit the description on the report were on the property. Agent Binkley said she took pictures and saw the trailer hitched to a truck.

Agent Binkley testified that she met the Defendant at the Center after the brand on the cattle was determined. She said she went to the Defendant's trailer and compared it to the trailer described in the report. She said she took photographs of the trailer's identification plate and the Defendant's truck's serial number. She said the trailer the Defendant drove was the same trailer she saw on Frank Wright's property. The Defendant told her the truck and trailer belonged to him. Agent Binkley said that the Defendant brought three additional cattle

to the Center but that they did not belong to Mr. Jarboe because each steer had an "X" brand, not DJ.

On cross-examination, Agent Binkley testified that a brand was limited to a single owner and that it was registered within their home state. She said Tennessee had a registry within the Department of Agriculture. She did not know if anyone used a brand that was similar to Mr. Jarboe's brand. She said she did not find orange ear tags on the cattle. She stated that it would be common to take the tags out but that she did not look for evidence of tags. She said that evidence of the tags being removed would not "necessarily be obvious" because cattle hair becomes thick in the winter. She did not know if anyone else looked for ear tags.

State of Tennessee Department of Agriculture Captain Mike Murry testified that he was a criminal investigator and that he went with Agent Binkley to the Center on November 28, 2006. He said he shaved the cattle and saw a "J over D" brand on all seven steers. Captain Murry wrote down the Defendant's statement, which states:

> I bought the cattle at Guthrie, Kentucky, pen-hooked them. I bought the trailer at West Spence, Arkansas. I bought the cattle 18-months ago and they were small, they were not branded. I bought the trailer last December. I paid $1800 for it. I paid $1.27 a pound for the calves, they weighed above three hundred pounds. I had ten head of cattle, two died of natural causes. Somebody shot the other one with a .22 rifle though the gut.

Captain Murry said the Defendant could not produce a bill of sale or any document showing that he purchased the cattle or trailer.

On cross-examination, Captain Murry testified that a buyer usually can produce a bill of sale or some other document to indicate ownership of cattle. He said that "pen-hooked" was where an owner parked a car at the end of a driveway, parking lot, or stockyard and people stopped and asked how much money they wanted for the item. He said "pen-hooked" also applied to cattle on the edge of a stockyard. He stated that buying cattle "pen-hooked" was a common practice to prevent the cost of a commission.

Captain Murry testified that he did not recall if he looked for or saw signs of ear tags. He said that the Department of Agriculture took possession of the Defendant's truck but that he did not look inside. He did not know if any other agent looked inside the truck or if a bill of sale was found. He also did not know if anyone else in the United States used a DJ brand.

Captain Murry stated that he did not check any state registry to determine if someone other than Mr. Jarboe used the DJ brand.

On redirect examination, Captain Murry testified that Mr. Jarboe came to Dickson County, identified the seven steers and the trailer as his stolen property, and took them back to Kansas. Captain Murry said that the seven steers were "beef steers" raised for consumption and that the Center did not slaughter cattle or process meat. He said the Center auctioned cattle to people who feed, fatten, and resell the cattle when they are fit for slaughter. Captain Murry stated that because the seven steers were ready for slaughter, they were worth more money than the livestock usually sold at the Center. He said that if someone were in a hurry to get rid of cattle, the Center would be a good place to take them for sale. He agreed that it would be faster and easier to sell cattle at the Center than to find a buyer to take them to a slaughterhouse. On recross-examination, Captain Murry agreed that there could be other reasons to bring a steer that was ready for slaughter to the Center, including financial troubles.

Tennessee Department of Agriculture Supervisory Agent Max Thomas testified that there was not a "ready market in Middle Tennessee" for cattle ready for slaughter. He said the closest slaughterhouse was in Knoxville, Tennessee. He stated that cattle growers in Dickson County raised calves to feeder size and sold them at auction as feeder cattle. He said that if someone had a steer in the same condition as the seven the Defendant brought to the Center, the owner raised it for "home or custom slaughter" to sell to individuals.

On cross-examination, Agent Thomas testified that it was "a little unusual" but not "completely unusual" for the Defendant to sell the type of cattle he brought to the Center. On redirect examination, Agent Thomas agreed that the Center was a "great place" to bring cattle for a quick sale.

Delbert Jarboe testified that he drove from Kansas to the Center to pick up his trailer and cattle secured by Mr. Lemons and the Tennessee Department of Agriculture. He said that in November 2006, he had fifteen head of cattle that were almost ready for market. He said that these calves were not feeder cattle and that they were about 700 pounds when he bought them at auction. Mr. Jarboe stated that at the time the ten cattle went missing, they each weighed between 1110 to 1200 pounds and were valued between $1100 to $1200 per steer. He stated that he branded his cattle with "an upside down DJ" and that the brand was registered.

Mr. Jarboe testified that the missing cattle were branded. He said he notified the police and gave them the trailer's serial number. He read serial number CD 206-285-9760

from an exhibit previously received and stated that the number was the serial number of his stolen trailer. Mr. Jarboe described the trailer as follows:

> It's a 20-foot gooseneck white trailer and the jack was on the left-hand side of the trailer . . . and in the trailer there were some plank boards . . . and it was sort of skinned up on the front end of the trailer.

He said that it was possible that someone entered his property, loaded the trailer with the cattle, and left without detection because his house was 200 yards away from where he kept the cattle. He said there were marks and manure on the ground where the cattle were loaded. He said he did not give anyone permission to come onto his property to take his trailer and cattle. He said he saw the cattle and trailer on the evening of November 22, 2006, and did not see either again until he arrived at the Center to recover them.

Mr. Jarboe testified that he paid $1700 for the trailer one year earlier but that he would not have sold the trailer for "even $3000" because the trailer could not be replaced. He identified the DJ brand on the cattle from the photographs previously received as exhibits. He said he was certain the seven steers and the trailer at the Center belonged to him. He said he had never heard of or met the Defendant before the theft of his cattle and trailer.

On cross-examination, Mr. Jarboe testified that when he first realized his trailer was missing, he thought someone had borrowed it. He stated that he telephoned a couple of people to make sure that no one borrowed the trailer and that he never saw the Defendant drive by his home.

Mr. Jarboe testified that his DJ brand was registered in Kansas but that the brand was not registered in any other state because each state had its own registry. He said he was unaware if a similar brand was used by other ranchers. He agreed it was possible that people in other states used the same brand and placed their brand in the same location on the cattle. Mr. Jarboe said he specifically recognized the cattle at the Center as his because he earmarked each steer and put a notch in the end of each ear. He said that the cattle's coloration and markings matched those of the cattle that were taken from his property and that he had never seen other cattle with the same coloration. Mr. Jarboe conceded that it was possible the cattle could have only resembled his cattle but said that the cattle had his unique ear markings. He agreed he did not know if someone borrowed the trailer and sold it to someone else.

Upon this evidence, the jury found the Defendant guilty of theft of property valued at ten thousand dollars or more but less than sixty thousand dollars. The trial court sentenced

-6-

the Defendant as a Range II, multiple offender to seven years' confinement. The Defendant filed a motion for a new trial following his conviction on the grounds that his right to a speedy trial was violated, the evidence was insufficient to support his conviction, and he received the ineffective assistance of counsel.

At the hearing on the motion for a new trial, the Defendant's original counsel testified that the Defendant gave him information about where he purchased the cattle and trailer. He said the Defendant claimed to have been at a truck stop along Interstate 40 in the western portion of Middle Tennessee when the Defendant noticed a man whose truck had engine trouble. He said the Defendant told him that the man was hauling cattle in a trailer attached to the truck and that the Defendant attempted to help the man but that they were not able to resolve the problem. He said the Defendant told him that the man "got frustrated" and offered to sell the cattle and trailer to the Defendant and that he bought the trailer and cattle from the man at the truck stop. Counsel went to the truck stop and spoke with all the employees, but no one remembered seeing a truck with a trailer full of cattle being repaired.

Counsel testified that the Defendant wanted him to find the title showing that he bought the cattle and trailer and that the Defendant told him the title was either in the Defendant's truck or the Defendant's brother's truck. He said he contacted the Defendant's brother, Frank Wright, who said he did not have any documents. Counsel stated that the Defendant first told him that he purchased the cattle and trailer from Bobby L. Jones and that he attempted to locate Mr. Jones. He said the Defendant "changed his story" and said he bought them from Robert Stafferd and Mr. Stafferd's brother-in-law. He stated that he asked the Defendant to describe these two men and that the Defendant described them in detail. He said the Defendant thought the men were from Kansas. Counsel said he learned from the District Attorney's Office that the man of whom the Defendant spoke was the victim, Delbert Jarboe. He stated that he contacted Mr. Jarboe but that Mr. Jarboe was more interested in the physical appearance of the person who sold the cattle to the Defendant. The Defendant authorized him to inform Mr. Jarboe that the man the Defendant bought the cattle and trailer from was Robert Stafferd, and he gave Mr. Jarboe a description of Mr. Stafferd. Counsel said Mr. Jarboe told him that he did not know a person matching that description.

Counsel testified that the Defendant claimed to have been at his apartment in Houston, Texas on the night of November 22, 2006. Counsel said the Defendant claimed that a non-uniformed Houston detective came to the door, kidnapped him, and took him to Kansas in the Defendant's own truck.

Counsel testified that the Defendant filed a complaint with the Board of Professional Responsibility and that he moved to withdraw as counsel, which was granted on December 10, 2007. He said the complaint was dismissed by the Board of Professional Responsibility.

He said the Defendant's complaints were about whether he failed to investigate. He stated that while he was the Defendant's counsel, he kept a diary of everything he did on the Defendant's behalf and that the diary was given to the Board of Professional Responsibility. He said he believed he did everything he was required to do to investigate the Defendant's case.

On cross-examination, counsel agreed that the Defendant's version of events changed as he investigated. He said that he determined the Defendant's version of events did not match the evidence in the case and that the Defendant apologized for being dishonest with him and admitted involvement in the theft. He said the Defendant asked him to try to reach a plea agreement. Counsel agreed that the Defendant was given a plea offer that would allow his sentence to run concurrently to his sixty-six-year sentence in Texas but that the Defendant did not want to accept the offer because it would automatically violate his parole in Texas.

Counsel testified that he was able to determine that Mr. Lemons could identify the Defendant at the Center and that another person could identify the Defendant as the person driving Mr. Jarboe's stolen trailer and cattle out of Kansas. He said he was able to determine that the trailer and cattle reported stolen by Mr. Jarboe "appeared the same" as the one the Defendant drove to the Center.

The record shows that after original counsel withdrew, another attorney was appointed to represent the Defendant, but he also had a conflict of interest and was permitted to withdraw on December 18, 2007. Trial counsel was appointed on January 24, 2008.

Trial counsel testified that the Defendant mentioned the title to the cattle and the trailer close to the time of the trial and that she contacted both the District Attorney's Office and an investigator to find out if the title had been found. She asked questions at the trial about the title, but no one could remember finding a title for the cattle or the trailer. She stated that the Defendant mentioned Robert Stafferd and Bobby Jones but that she was unable to find either person because the Defendant was unable to provide any additional information. She said that the Defendant mentioned the same alibi he had mentioned to his former counsel but that the Defendant told her that a U.S. Marshal took him from his Texas apartment. She said the Defendant could not give her the additional information she needed to locate the officers or Marshals. She said that she spoke with Mr. Lemons and that he was able to identify the Defendant and the cattle the Defendant brought to the Center.

On cross-examination, trial counsel testified that she went "down all kinds of avenues . . . to verify" the facts the Defendant gave her. She said she investigated branding to see if anyone used the DJ brand. She said that she also investigated the trailer, the photographs, and the registrations, and that she tried to verify each version of events the Defendant gave.

She said the event the Defendant described with the Marshals in Texas could have been his extradition to Tennessee.

On redirect examination, trial counsel testified that Mr. Lemons identified the Defendant at the trial and said the Defendant was the person who brought the cattle to the Center. She could not recall if there was a discrepancy in the testimony given by any of the investigating agents about the number of steers that were delivered to the Center. She read a portion of the trial transcript when Agent Binkley testified that the day after the Defendant brought the seven cattle to the Center, he returned with three more cattle that did not belong to Mr. Jarboe. Trial counsel agreed that an affidavit of complaint stated that the Defendant returned with two steers rather than three.

Upon this evidence, the trial court denied relief on the motion for a new trial. The trial court found the proof to be sufficient to support the jury's verdict. The trial court also found that the evidence was overwhelming for a conviction and that both counsel were competent and performed sufficiently. The trial court did not address the Defendant's claim that the State violated his constitutional right to a speedy trial. We also note that the record does not show that counsel presented proof or made an argument on the issue, or that counsel asked the trial court to rule on the issue. This appeal followed.

## I

The Defendant contends that his right to a speedy trial was violated under the United States and Tennessee Constitutions because he was arrested on December 5, 2006, but not tried and convicted until May 20, 2008. The Defendant was in custody for approximately eighteen months awaiting trial. The State argues the Defendant failed to establish that his constitutional right to a speedy trial was violated. We agree with the State.

The United States and Tennessee Constitutions guarantee a criminal defendant the right to a speedy trial. U.S. Const. amend VI; Tenn Const. art I, § 9; State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997). In Tennessee, defendants have a statutory right to a speedy trial under Tennessee Code Annotated section 40-14-101 (2010). The right to a speedy trial is designed "to protect the accused against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished." Utley, 956 S.W.2d at 492 (citing Doggett v. United States, 505 U.S. 647, 654 (1992)). In determining whether a defendant has been denied a speedy trial, a court considers the following four factors: (1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of the right to a speedy trial, and (4) the prejudice to the defendant. State v. Bishop, 493 S.W.2d 81, 83-84 (Tenn. 1973) (citing Barker v. Wingo, 407 U.S. 514 (1972)).

The record shows that the Defendant, through his original counsel, filed a motion for a speedy trial on October 3, 2007. On the same day, the Defendant's original counsel filed a motion to be relieved as counsel due to the Defendant's complaint filed with the Board of Professional Responsibility. On October 15, 2007, the Defendant filed a pro se motion to dismiss the indictment pursuant to Tennessee Rule of Criminal Procedure 48(b)(2) due to an unreasonable delay in bringing him to trial. The record does not show, however, that the trial court addressed the Defendant's motion. The record shows that another attorney was appointed to represent the Defendant on December 10, 2007, but that counsel learned of a conflict of interest that required his withdrawal. On January 24, 2008, trial counsel was appointed, and the trial began on May 20, 2008. The record shows that the evidence presented during the hearing on the motion centered around the ineffective assistance of counsel and sufficiency of the evidence claims and that no evidence or argument was presented regarding the speedy trial issue. Further, the Defendant did not request a ruling from the trial court on the issue, and thus, the record is not fully developed on this issue. We will, nevertheless, conduct a de novo review of the record before us. See State v. Hawk, 170 S.W.3d 547, 549 (Tenn. 2005) (employing de novo standard for review of a speedy trial claim).

As for the first factor, a one year delay in a trial is sufficient to trigger further inquiry and a balancing test determines the merit of the speedy trial issue. Doggett, 505 U.S. at 652; Utley, 956 S.W.2d at 494. The length of the delay between the Defendant's arrest and trial exceeds one year. This is sufficient to trigger further inquiry and apply the balancing test to determine the merit of the speedy trial issue. See Doggett, 505 U.S. at 652; Utley, 956 S.W.2d at 494. Nonetheless, our supreme court has stated that "while the length of delay of two years . . . is a factor supporting a claim of lack of a speedy trial, . . . this fact alone will [not] support a finding that [a] defendant has been denied his constitutional right to a speedy trial." Bishop, 493 S.W.2d at 84. While the approximate eighteen month delay between the arrest and the trial is sufficient to trigger the application of the balancing test, this period of delay is not unreasonable when compared to other cases. See State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996) (holding a delay of thirteen years unreasonable); cf. State v. Simmons, 54 S.W.3d 755, 759 (Tenn. 2001) (holding a twenty-three month delay between the return of the indictment and the Defendant's arrest "not necessarily unreasonable.").

With regard to the second factor, reasons for the delay fall into to one of four categories. A delay can be "intentional . . . to gain a tactical advantage over the defense or delay designed to harass the defendant." Wood, 924 S.W.2d at 346. An intentional delay is weighted heavily in favor of the Defendant. Id. at 347. A delay can be the result of "bureaucratic indifference or negligence" and is weighed in favor of the Defendant. Id. at 346-47. Delays in proceeding to trial can also be "necessary to the fair and effective prosecution of the case," and if so, the delay is "justifiable and is not weighed against either

party." Id. at 347. A delay can be "caused, or acquiesced in, by the defense," and such a delay is weighed against the Defendant. Id.; Eric B. Blakemore v. State, W2004-01578-CCA-R3-PC, Shelby County (Tenn. Crim. App. September 12, 2005), app. denied (Tenn. Jan. 30, 2006).

As for the reasons for the delay, the Defendant argues there was no legitimate reason for the delay. The State responds that the delay was the result of the Defendant's desire for new counsel. We agree with the State. While the record is not clear when the Defendant filed his complaint with the Board of Professional Responsibility, his original counsel testified that after he was notified of the complaint, he requested permission to withdraw as counsel on October 3, 2007 and was permitted to do so on December 10, 2007. Another attorney was appointed on the same day, but a conflict of interest existed and he requested permission to withdraw on December 18, 2007. The Defendant's trial counsel was appointed on January 24, 2008. The trial began on May 20, 2008. There is no evidence that the delay in this case was attributable to the State, but there is evidence that the delay was due, at least in part, to the Defendant's desire for new counsel, and that the trial court acted within a reasonable time on the Defendant's request. The Defendant, however, could not have foreseen that his second attorney would also have a conflict of interest, further delaying the trial. The delay became necessary to the fair and effective prosecution of the Defendant until trial counsel could be appointed. Although the continued delay was not the fault of the Defendant and weighs neither against him nor in his favor, the initial reason for the delay was his desire for new counsel. This factor is not weighted against either party. See Wood, 924 S.W.2d at 347.

With regard to the third factor, "the fact that a defendant fails to demand a speedy trial is not a waiver of the right, but is one of the facts to be considered." Farr v. State, 506 S.W.2d 811, 814 (Tenn. Crim. App. 1974); see Bishop, 493 S.W.2d at 84. However, "a failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." Farr, 506 S.W.2d at 814 (citing Barker, 407 U.S. 514 (1972)). The record shows that the Defendant asserted his right to a speedy trial through his original counsel by filing a motion or notice for a speedy trial on October 3, 2007. The Defendant filed a pro se motion to dismiss under Tennessee Rule of Criminal Procedure 48(b)(2) on October 15, 2007. This factor weighs in favor of the Defendant. See Farr, 506 S.W.2d at 814; Bishop, 493 S.W.2d at 84.

The final and most important factor to consider is prejudice to the Defendant. Our supreme court has stated that the prejudice factor is viewed in light of three interests. Bishop, 493 S.W.2d at 85. First, there is an interest to "prevent undue and oppressive incarceration prior to trial." Id. There is also an interest "to minimize [the] anxiety and

concern accompanying public accusation" and "to limit the possibilities that long delay impairs the ability of the accused to defend himself." Id.

Although the Defendant is not required to prove a particular prejudice, the Defendant fails to state how he has been prejudiced by the eighteen-month delay. See Simmons, 54 S.W.3d at 760 (citing Doggett, 505 U.S. at 654-55; Wood, 924 S.W.2d at 348). We cannot speculate how the Defendant was harmed by the delay when no harm is apparent. Nevertheless, we do not think the eighteen-month delay between the Defendant's arrest and the trial created undue and oppressive incarceration, maximized his anxiety and concern beyond the normal levels of anxiety and concern that accompany a criminal prosecution, or impaired the ability of the Defendant to aid in his defense. The Defendant is not entitled to relief.

## II

The Defendant contends that the evidence was insufficient to support his conviction. He does not, however, point to any weakness in the State's proof. We conclude that the evidence was sufficient to support the conviction.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the "credibility of the witnesses, the weight to be given to their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." State v. Dotson, 254 S.W.3d 378, 395 (Tenn. 2008) (citing State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007)); see State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Taken in the light most favorable to the State, Mr. Lemons identified the Defendant as the person who brought seven large steers in a twenty-foot gooseneck trailer to the Center on November 27, 2006. A Livestock Marketing Agency report showed a trailer and ten cattle were stolen from Kansas. The cattle the Defendant brought for auction matched the description of the stolen cattle and had the same brand as the missing cattle. The cattle the

Defendant brought to the Center did not have ear tags, but the Agency report indicated that the cattle had orange ear tags. Mr. Lemons stated that ear tags could be removed in seconds and that the holes in the cattle's ears closed quickly.

Mr. Jarboe was certain the seven cattle with his registered DJ brand and the trailer belonged to him. He specifically recognized the cattle as his, due to the unique ear markings and coloration. Mr. Jarboe valued his steers between $1100 to $1200 per steer. The serial number on the trailer that the Defendant drove matched the serial number listed on the stolen report. This serial number was confirmed by Mr. Jarboe as the serial number on the trailer taken from his Kansas property without his permission. Mr. Jarboe paid $1700 for his trailer.

We conclude that a rational trier of fact could have found beyond a reasonable doubt the elements of theft of property and that the property obtained was valued at ten thousand dollars or more but less than sixty thousand dollars. The evidence is sufficient to support the Defendant's conviction, and he is not entitled to relief on this issue.

### III

The Defendant contends that he received the ineffective assistance of counsel from original and trial counsel in that they both failed to locate critical evidence including corroborating witnesses and documentation of the sale of the cattle and trailer that belonged to Mr. Jarboe. The Defendant also contends that he received the ineffective assistance of counsel from trial counsel because she failed to make proper objections at the trial and fell below the objective standards of reasonableness and competence. The State argues that the Defendant received the effective assistance of counsel. We agree with the State.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the defendant to show by clear and convincing evidence (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. at 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). A defendant will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997); see Calvert v. State, 342 S.W.3d 477, 486 (Tenn. 2011). The performance prong requires a defendant raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690; Calvert, 342 S.W.3d at 486. The prejudice prong requires a defendant to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; see Calvert, 342 S.W.3d at 486. "A

defendant's 'failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance of counsel claim.'" Calvert, 342 S.W.3d at 486 (quoting Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996)).

Our supreme court has determined that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). See id. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201. Further, this court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001).

With respect to the allegations against the Defendant's original counsel, the record reflects that counsel offered an explanation for his inability to locate corroborating witnesses and documentation of the sale of the cattle and trailer and that the trial court accredited his testimony in denying the Defendant's motion for a new trial. The record shows that he attempted to verify each of the Defendant's versions of events. The Defendant told counsel that he tried to help a man at a truck stop having engine problems with his truck but that they were not able to resolve the problem. The Defendant told counsel that the man became frustrated and offered to sell the trailer full of cattle and that he bought the trailer and cattle from the man. Upon learning this information, counsel went to the truck stop and questioned the employees, but the employees did not recall seeing a truck with a trailer full of cattle being repaired.

Counsel testified that the Defendant first told him that he bought the trailer and cattle from Bobby Jones and that he tried to locate Mr. Jones. Counsel said the Defendant

-14-

"changed his story" to say he bought the trailer and cattle from Robert Stafferd. Counsel's investigation revealed that the man of whom the Defendant spoke was the victim. Counsel said the Defendant told him that documentation of the purchase was in his truck or his brother's truck. Counsel contacted the Defendant's brother to determine if the documentation could be located, but the Defendant's brother said he did not have any documents. Counsel also negotiated a plea agreement on the Defendant's behalf that would have allowed the sentence to run concurrently with his existing sentence in Texas. We hold that the trial court properly determined that the Defendant failed to establish that counsel's performance was deficient or that he was prejudiced by counsel's performance. The trial court properly denied relief based upon the claim regarding original counsel's representation.

With regard to the allegations against trial counsel, the record reflects that counsel explained her inability to locate corroborating witnesses and documentation of the sale of the cattle and trailer and that the trial court accredited her testimony in denying the Defendant's motion for a new trial. The record shows that she contacted the District Attorney's Office and an investigator to find out if any documents existed that showed that the Defendant bought the trailer and cattle. She questioned witnesses at the trial about the title, but the witnesses did not recall finding a title or other documentation. As with his original counsel, the Defendant "changed his story" regarding from whom he bought the trailer and cattle and trial counsel investigated each time. First, the Defendant told trial counsel he bought the items from Bobby Jones. Counsel stated that she attempted to find Mr. Jones but that the Defendant could not provide her with needed additional information to locate him. She said that the Defendant then told her he bought the items from Robert Stafferd but that he, too, could not be found. Counsel said that the Defendant told her he was in his Texas apartment the night the trailer and cattle went missing and that the police took him from his home to Kansas. She said she attempted to find documentation that law enforcement took him to Kansas but the Defendant could not give her the information she needed to locate the officers or Marshals.

Trial counsel testified that she spoke with Mr. Lemons and that he was able to identify the Defendant and the cattle the Defendant brought to the Center for auction. She stated that she "went down all kinds of avenues . . . to verify" the facts given by the Defendant. She said she investigated branding and if anyone else used the DJ brand. She stated that she investigated the trailer, photographs, and registrations. The trial court accredited trial counsel's testimony and concluded that the Defendant failed to prove that trial counsel's performance was deficient or that the Defendant suffered any prejudice. The evidence does not preponderate against the trial court's factual findings.

The Defendant also contends that he received the ineffective assistance of counsel from trial counsel because she failed to make proper objections at the trial and fell below the objective standards of reasonableness and competence. The Defendant did not raise this

allegation of ineffective assistance of counsel in his motion for a new trial. Because the issue was not raised in the motion for a new trial, our consideration of it is waived. <u>See</u> T.R.A.P. 3(e) (providing that appellate review is limited to issues that were specifically stated in the motion for new trial), 36(a) (providing that "relief may not be granted in contravention of the province of the trier of fact").

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE